AO 91 (Rev. 11/11) Criminal Complaint

AUSA Andrew C. Erskine (312) 353-1875

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**FILED**

DEC 1 3 2017

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

UNITED STATES OF AMERICA

v.

SANCHEZ LACKLAND and
JERMOL MIXON

CASE NUMBER:

**17CR    797**

MAGISTRATE JUDGE KIM

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

**COUNT ONE**

On or about December 12, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant SANCHEZ LACKLAND violated:

| Code Section | Offense Description |
| --- | --- |
| Title 21, United States Code, Section 846 | knowingly and intentionally attempting to possess with intent to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of butyryl fentanyl, a Schedule I Controlled Substance and an analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II Controlled Substance |

**COUNT TWO**

On or about December 12, 2017, at Orland Park, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant JERMOL MIXON violated:

| Code Section | Offense Description |
| --- | --- |
| Title 21, United States Code, Section 841(a)(1) | knowingly and intentionally possessing with intent to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of butyryl fentanyl, a Schedule I Controlled Substance and an analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____
MARK WASUNYK
Special Agent, Homeland Security Investigations
(HSI)

Sworn to before me and signed in my presence.

Date: <u>December 13, 2017</u>

_____
*Judge's signature*

City and state: <u>Chicago, Illinois</u>

<u>YOUNG B. KIM, U.S. Magistrate Judge</u>
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS | ss

### **AFFIDAVIT**

I, MARK WASUNYK, being duly sworn, state as follows:

1.      I am a Special Agent with Homeland Security Investigations, and have been so employed for approximately eight years. My current responsibilities include the investigation of narcotics trafficking offenses.

2.      As part of my duties as Homeland Security Investigations Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances. I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

3.      This affidavit is submitted in support of a criminal complaint alleging that (a) SANCHEZ LACKLAND has violated Title 21, United States Code, Section 846 and (b) JERMOL MIXON has violated Title 21, United States Code, Section

841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of complaints charging LACKLAND with attempted possession of a fentanyl analogue with intent to distribute, and MIXON with possession of a fentanyl analogue with intent to distribute, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, and information provided by other third parties.

## FACTS ESTABLISHING PROBABLE CAUSE

5.     In summary, HSI and the DEA have been investigating multiple individuals in Chicago who have been importing fentanyl and fentanyl analogues from China and Hong Kong into Chicago and then distributing these controlled substances, as well as heroin and cocaine, in the Chicago area. The investigation has shown that, on or about December 12, 2017, one of the members of this group, LACKLAND, attempted to obtain a package that contained approximately 538 grams of cyclohexyl fentanyl, a fentanyl analogue and a portion of which also contained butyryl fentanyl, which is another fentanyl analogue. This investigation has also shown that, on the same day and within hours of LACKLAND delivering a bag to MIXON's residence, MIXON was found in possession of approximately 520 grams of a mixture of cyclohexyl fentanyl and butyryl fentanyl.

***Agents Intercept One Kilogram of Acryl Fentanyl (a Fentanyl Analogue)* En Route *to Individual A (February 2017)***

6. According to records from U.S. Customs and Border Protection, on or about February 27, 2017, a parcel was shipped from Hong Kong to Individual A. Law enforcement intercepted this package on or about March 1, 2017, and, pursuant to border-search authority, its contents were examined in a CBP laboratory. The package was found to contain a substance weighing approximately 1,072 grams. CBP officers performed a field test and found that the substance presumptively contained acryl fentanyl—a powerful and lethal fentanyl analogue.

***In late-October 2017, Individual A Was Shipped Three Packages from China***

7. In late-October 2017, Individual A was shipped three packages from China on the same day. According to records from U.S. Custom and Border Protection, on or about October 20, 2017, three packages arrived in the United States destined for Individual A. The packages were not seized or submitted for further inspection (such as a canine sniff). They weighed 670 grams, 670 grams, and 520 grams, respectively. Two packages were declared to contain "SILICA GEL DESICCANT" and one was declared to contain "POTASSIUM FORMATE." All three packages came from Shenzhen, China.

8. Based on my training and experience, and on the investigation to date—including the seizure of a package destined for Individual A that contained a large quantity of a fentanyl analogue—I believe one or more of these packages actually

3

contained a quantity of a controlled substances, just as the February 2017 package had.

### *Someone using a device within the LACKLAND Residence recently tracked the progress of shipments containing fentanyl and fentanyl analogues*

9. According to records kept by the United States Postal Service ("USPS"), on or about November 16, 2017 a USPS parcel bearing tracking number EA289721523HK ("Subject Parcel 1") entered the United States from Hong Kong, China. The Subject Parcel was sent via priority mail, with the ability to track the parcel through the tracking number. Subject Parcel 1 was destined for an address in Markham, Illinois, that—according to Secretary of State records—LACKLAND had previously listed on his driver's license. Pursuant to border search authority, on November 19, 2017, Subject Parcel 1 underwent inspection at the International Mail Branch at O'Hare International Airport in Chicago, Illinois. Subject Parcel 1 was found to contain approximately 517 grams of a white powder-like substance split amongst two bags. A U.S. Customs and Border Protection ("CBP") officer used the Thermo Scientific Gemini Analyzer to field test the contents. The powder in Bag #1 was presumptively identified as containing a combination of Cyclohexyl Fentanyl and Butyryl Fentanyl (258 grams). Cyclohexyl Fentanyl is an opioid analgesic and analogue to fentanyl, a Schedule II controlled substance. Butyryl Fentanyl is a Schedule I controlled substance and also a fentanyl analogue. The powder in Bag #2 was presumptively identified as containing a combinations of Methoxyacetyl

4

Fentanyl and Butyryl Fentanyl (259 grams), both of which are Schedule I controlled substances and fentanyl analogues.[1]

10.     Based on my training and experience, I know that individuals can track packages being delivered by the United States Postal Service—including inbound international packages—by visiting the USPS website and entering the associated tracking numbers. I also know based on training and experience that the USPS website makes a record of a website visitor's IP address, including when a website visitor visits the website and tracks a package. According to USPS records, an individual using the IP address 24.1.213.158 ("the LACKLAND Residence IP Address") used the USPS website to track the shipping progress of Subject Parcel 1 on the 19th, 20th, 21st, 22nd, 23rd, 24th, 28th, and 29th of November 2017, as well as on the 1st, 2nd, 3rd, 4th, 5th, 6th, and 7th of December 2017.

11.     According to records from Comcast dated December 6, 2017, Comcast assigned the LACKLAND Residence IP Address on June 10, 2017, to the account bearing the Subscriber Name "SANCHEZ LACKLAND" at the 18000 block of Kedzie Avenue in Hazel Crest, Illinois (the "LACKLAND Residence").[2]     On or about December 8, 2017, surveillance observed a mailbox at the LACKLAND Residence

---

[1] On or about December 4, 2017, Magistrate Judge Jeffrey Cole issued a warrant authorizing the search of the destination address upon the receipt of Subject Parcel 1.

[2] Comcast records state that the "Lease Expiration" for this IP address was November 30, 2017. However, based on my training and experience, I know that Comcast often reassigns IP addresses to the same account after a lease term expires. As a result, based on the tracking information, the information from Comcast, and on my training and experience, I believe that the IP address 24.1.213.158 was reassigned to the LACKLAND Residence after it expired on November 30, 2017, and that the tracking records dated after November 30, 2017, are for tracking conducted from the LACKLAND Residence.

with two names, one of which was "Sanchez Lackland" and the other was a woman who later identified herself to agents as LACKLAND's daughter's mother.

12. According to records kept by the United States Postal Service ("USPS"), on or about November 16, 2017 a USPS parcel bearing tracking number EA289721510HK ("Subject Parcel 2") entered the United States from Hong Kong, China. Subject Parcel 2 was sent via priority mail, with the ability to track the parcel through the tracking number. Pursuant to border search authority, on November 21, 2017, Subject Parcel 2 underwent inspection at the International Mail Branch at O'Hare International Airport in Chicago, Illinois. Subject Parcel 2 was found to contain a total of approximately 538 grams of a white powder-like substance separated into two packages. A U.S. Customs and Border Protection ("CBP") officer used the Thermo Scientific Gemini Analyzer to field test the contents. The powder in both packages was presumptively identified as Cyclohexyl Fentanyl, an opioid analgesic and analogue to fentanyl, a Schedule II controlled substance.[3] A portion of the powder in one of the two packages was also found to contain Butyryl Fentanyl, a Schedule I controlled substance and fentanyl analogue. According to USPS records, an individual using the LACKLAND Residence IP Address used the USPS website to track the shipping progress of Subject Parcel 2 on the 18th, 19th, 20th, 21st, 24th, 28th, 29th, and 30th of November 2017, as well as on the 2nd, 3rd, 4th, 5th, 7th, and 8th of December 2017.

---

[3] On or about December 4, 2017, Magistrate Judge Jeffrey Cole issued a warrant authorizing the search of the destination address upon the receipt of Subject Parcel 2.

13.     According to records kept by the United States Postal Service ("USPS"), on or about November 16, 2017 a USPS parcel bearing tracking number EA289721506HK ("Subject Parcel 3") entered the United States from Hong Kong, China. Subject Parcel 3 was sent via priority mail, with the ability to track the parcel through the tracking number. Pursuant to border search authority, on November 29, 2017, Subject Parcel 3 underwent inspection at the International Mail Branch at O'Hare International Airport in Chicago, Illinois.  Subject Parcel 3 was found to contain approximately 526 grams of a white powder-like substance. A U.S. Customs and Border Protection ("CBP") officer used the Thermo Scientific Gemini Analyzer to field test the contents.  The powder was presumptively identified as Cyclohexyl Fentanyl, an opioid analgesic and analogue to fentanyl, a Schedule II controlled substance.[4] According to USPS records, an individual using the LACKLAND Residence IP Address used the USPS website to track the shipping progress of Subject Parcel 3 on the 18th, 19th, 20th, 21st, 22nd, 24th, 28th, 29th, and 30th of November 2017, as well as on the 1st, 2nd, 3rd, 4th, 5th, 6th and 7th of December 2017.

14.     Based on my training, experience, and familiarity with this case – including LACKLAND's subsequent receipt and opening of Subject Parcel 2 (as discussed below) – I believe that LACKLAND was the individual tracking the progress of Subject Parcels 1, 2, and 3 from the LACKLAND Residence, that he knew

---

[4] On or about December 4, 2017, Magistrate Judge Jeffrey Cole issued a warrant authorizing the search of the destination address upon the receipt of Subject Parcel 3.

that the packages contained quantities of a fentanyl analogue, and that he intended to participate in some manner in its manufacture and distribution.

### *Between November 20, 2017, and December 10, 2017, the LACKLAND's Residence was used to track at least 9 other packages from China or Hong Kong that contained fentanyl or a fentanyl analogue*

15.     According to records from the United States Postal Service and from U.S. Customs and Border Protection, between on or about November 20, 2017, and December 10, 2017, the LACKLAND Residence IP Address tracked the progress of approximately 53 separate packages that were traveling from China or Hong Kong to the United States, including the three seized packages containing fentanyl and fentanyl analogues, discussed above. Furthermore:

       a.     Approximately 44 of those 53 packages were addressed to approximately 19 different addresses in the Chicago area and none of those addresses was the LACKLAND Residence, yet all 44 of those packages have been tracked by the LACKLAND Residence IP Address.[5]

       b.     As of December 11, 2017, approximately 27 of these 53 packages were still in transit, approximately 14 were delivered, and approximately 12 were intercepted by law enforcement (including the three packages discussed in detail above).

       c.     Of the approximately 12 intercepted packages that the LACKLAND Residence IP Address tracked, approximately 11 packages (including

---

[5] The LACKLAND Residence was not a listed address of any of the 53 packages. Six packages were sent to Peoria, Illinois. The intended address for 9 packages is not yet known.

the three packages discussed in detail above) were found to contain fentanyl or fentanyl analogues after field testing by law enforcement.

### LACKLAND is associated with Individual A who is also active in fentanyl importation and distribution

16.     As discussed above, the investigation to date has shown that Individual A is also involved with importing and distributing fentanyl and fentanyl analogues. In addition to the packages containing fentanyl and fentanyl analogues associated with Individual A discussed above:

a.     According to records provided by a pill press distributor, in or about February 2017—around the same time that law enforcement seized about one kilogram of a fentanyl analogue addressed to him—Individual A ordered a pill press from the company to communicate about the order with the company over the course of several months.

b.     According to a Currency Transaction Report filed on or about November 9, 2017, on or about November 7, 2017, Individual A used $20,000 in cash at a kiosk located 400 E. 103rd Street, Chicago, Illinois, to purchase Bitcoin. The Currency Transaction Report identifies Individual A by his full name, lists his address, lists Individual A's social security number, and lists his phone number (Subject Phone 1). Based on my training and experience I know that, although Bitcoin may be used for legitimate purposes, due to its high degree of anonymity and the ease and speed with which funds can be moved electronically, Bitcoin has been used by individuals and enterprises as a means to facilitate illicit transactions and launder criminally derived proceeds. In addition, this transaction took place just about two

weeks before the above-described influx of packages being sent from China and Hong Kong. Based on my training and experience, I believe Individual A bought $20,000 worth of Bitcoin to use to buy the narcotics being shipped in these 53 packages.

17.     According to records from the Illinois Secretary of State, on or about July 26, 2017, "LACKLAND, SANCHEZ" and Individual A (the man associated with the fentanyl and fentanyl analogue shipments discussed above and below) are the registered managers of an entity named Certified Realtor Group LLC.

18.     According to records from Ria Financial Services, on or about June 23, 2017, LACKLAND initiated a $2,500 money transfer to a person in California. During the money transfer process, LACKLAND provided a phone number ending 2807 ("Subject Phone 2") as his telephone number. According to toll records for the number ending 9313 ("Subject Phone 1"), which is believed to be used by Individual A,[6] Subject Phone 1 (Individual A) and Subject Phone 2 (LACKLAND) were in contact approximately 37 times between approximately December 1, 2017, and December 7, 2017.  During approximately this same period of time, law enforcement personnel were locating, testing, and seizing 11 of the 12 packages being tracked by the LACKLAND Residence IP address, which packages were found to contain fentanyl and fentanyl analogues. During the same period, the LACKLAND Residence IP address was tracking these and others of the 53 packages discussed above.

---

[6] According to records from Sprint dated September 7, 2017, Individual A established the account associated with on or about January 11, 2017.

19. Based on my training, experience, and familiarity with this case—including the use of the LACKLAND Residence IP address to track packages containing fentanyl and fentanyl analogues and the toll records—I believe that during these calls, Individual A and LACKLAND had discussions regarding the possession, manufacture, or distribution of fentanyl and fentanyl analogues.

### LACKLAND and Individual A delivered a bag thought to contain narcotics to MIXON's Residence

20. On or about December 11, 2017, Magistrate Judge Young B. Kim issued a warrant to search the LACKLAND Residence for evidence, instrumentalities, fruits, and contraband relating to federal narcotics violations.

21. On or about December 12, 2017, at approximately 1:17 p.m., agents observed a White Jaguar SUV ("Lackland Vehicle 1") arrive at the LACKLAND Residence. Agents observed LACKLAND exit the SUV—which was being driven by Individual A.[7] Agents observed LACKLAND carrying a duffel bag and enter the LACKLAND Residence. Agents observed that the duffel bag LACKLAND was carrying was not full. A few minutes later, agents observed LACKLAND exit the LACKLAND Residence carrying the same duffel bag that, at that time, appeared heavier and to require more effort by LACKLAND to carry. Agents observed LACKLAND place the bag in Lackland Vehicle A.

22. Based on my training, experience, and familiarity with this case – Including the aforementioned evidence of LACKLAND and Individual A's joint

---

[7] Agents recognized LACKLAND and Individual A based on governmental photographs (driver's license).

association with multiple packages found to contain fentanyl analogue; LACKLAND's use of the LACKLAND residence to track those packages; and the later discovery, described below, of heroin, narcotics proceeds, and a gun stored together in LACKLAND's closet – I believe that during this stop at LACKLAND's Residence, Individual A and LACKLAND filled the not-filled bag that they brought to the LACKLAND Residence with narcotics (perhaps heroin laced with fentanyl analogue) and departed the residence to distribute to one or more associates, including MIXON, at a residence on the 16100 block of Hackney Drive in Orland Park, Illinois ("the MIXON Residence").

23. At about 1:23 p.m., Lackland Vehicle 1 departed the LACKLAND Residence and traveled to the location where Subject Parcel 1 had been destined. Earlier in the day, agents left a USPS note on the door of this residence saying Subject Parcel 1 could be retrieved at the local post office as of 3:30 p.m. Agents observed Individual A drive himself and LACKLAND to this residence, where LACKLAND got out and retrieved the door note. LACKLAND got back in Lackland Vehicle 1.

24. Agents observed Lackland Vehicle 1 travel southbound on I-57, eastbound on I-80, and exit northbound on LaGrange Road. Agents observed the Lackland Vehicle 1 stop at Lifetime Fitness and it was observed doing several U-turns. Air surveillance observed Lackland Vehicle 1 drive northbound on 97th Avenue, southbound on 97th Avenue, and then southbound again on 97th Avenue from 163rd Street. Based on my training and experience, I believe Individual A and

LACKLAND were performing counter-surveillance measures to avoid detection by law enforcement, because they were transporting narcotics at the time.

25.    At approximately 2:18 p.m., surveillance observed Lackland Vehicle 1 arrive at the MIXON Residence. Surveillance observed LACKLAND and Individual A exit the vehicle. Surveillance observed Individual A carry the same duffel bag and enter the door of the MIXON Residence with LACKLAND. Approximately 10 minutes later, surveillance observed both men leave the MIXON Residence and neither had the duffel bag. Surveillance observed Lackland Vehicle 1 depart the area and head back towards the location where LACKLAND had retrieved the door note. Agents observed a younger female join LACKLAND and Individual A.

26.    Based on my training, experience, and familiarity with this case – including the aforementioned evidence of LACKLAND and Individual A's joint association with multiple packages found to contain fentanyl analogue; the later discovery of heroin, narcotics proceeds, and a gun stored together in LACKLAND's closet; and the short amount of time they spent at the MIXON Residence, where they left the duffle bag behind – I believe that Individual A and LACKLAND delivered a quantity of narcotics/heroin laced with fentanyl to an associate at the MIXON Residence.

27.    According to pen-register records for Subject Phone 1, less than an hour before Lackland and Individual A arrived at the MIXON Residence, at approximately 1:26 p.m. and 1:44 p.m., Individual A was in contact with a phone number ending 8712 that is registered to Individual C. According to a database that, in my

experience, analyzes numerous records from various data sources, including financial and governmental institutions, to provide accurate identifying information regarding individuals, Individual C's phone number is associated with a utility record (dated approximately November 2017) for the MIXON Residence. In addition. sometime after approximately 5:00 p.m., surveillance observed at the MIXON Residence a Black BMW that is, according to Illinois Secretary of State records, registered to Individual C. Based on my training and experience, and the investigation to date, I believe that, during those phone calls, Individual A was making arrangements for LACKLAND and Individual A to deliver narcotics or narcotics-related items to MIXON at the MIXON Residence.

28.     At approximately 3:24 p.m., agents observed Lackland Vehicle 1, which contained LACKLAND, Individual A, and the younger female, drive to the area of 208 East 107th Street. Agents observed Individual A exit Lackland Vehicle 1, enter a White Mercedes, and depart the area. Agents observed LACKLAND exit Lackland Vehicle 1, get in its driver's seat, and depart the area.

29.     Agents observed LACKLAND drive to the residence where Subject Parcel 2 had been destined. Earlier in the day, agents had delivered Subject Parcel 2 to this residence and an individual who came to the door accepted Subject Parcel 2, which was equipped with a tracking device and trigger, and took it into the residence. At approximately 3:32 p.m., agents observed LACKLAND enter this residence, exit shortly after carrying Subject Parcel 2, enter a Silver Camaro ("Lackland Vehicle 2"), and then depart the area. Shortly thereafter, agents received a signal indicating the

Subject Parcel 2 (which had previously been found to contain 538 grams of a substance containing cyclohexyl fentanyl and, in part, butyryl fentanyl) had been opened. Agents stopped Lackland Vehicle 2, retrieved Subject Parcel 2 (which was hidden under the driver's seat), and arrested LACKLAND.

### Agents executed a search warrant at the LACKLAND Residence and seized narcotics and narcotics-related items

30.     At approximately 4:10 p.m., agents executed the search warrant on the LACKLAND residence. In the main bedroom, agents observed a closet that was half men's clothes and half women's clothes. On the side with men's clothes, agents found a firearm, approximately one kilogram of what is thought to be heroin, approximately one kilogram of what is thought to be fentanyl (or a fentanyl analogue),[8] and a sizeable amount of cash (more than $100,000). Agents also found indicia that LACKLAND lived there, including his wallet and mail addressed to him.

### An associate of LACKLAND and Individual A delivered bags to the MIXON Residence

31.     At approximately 7:52 p.m., agents observed a Black Cadillac (registration AJ71423) park at the MIXON Residence. Agents observed a male (thought to be MIXON) remove between 3 to 5 garbage bags from the trunk of the Black Cadillac. The first such bag appeared to be heavy. Based on my training and experience, including the investigation to date, I believed the black bags contained

---

[8] Agents used a scanning device on these substances that was not able to presumptively identify the substances. But based on the agents' training and experience, they are believed to be heroin and fentanyl (or a fentanyl analogue).

narcotics or narcotics-related items, which may have been transported from other locations following the arrest of LACKLAND.

32.     According to public records, the Black Cadillac is registered to JERMOL MIXON on the 400 block of East 95th Street, Chicago, Illinois. MIXON is also listed as a manager of the LLC described above (along with LACKLAND and Individual A). According to records from Western Union, on or about November 6, 2017, MIXON made a Western Union money transfer for $500 to Individual D. According to records from Western Union, Individual A previously transferred money to Individual D as well.

33.     At approximately 9:00 p.m., a male (thought to be MIXON) drove the Black Cadillac into the garage at the MIXON Residence.

34.     According to records from Ria Financial Services, on or about May 15, 2017, Individual C transferred $2000 to MIXON.

35.     According to pen register records, on December 12, 2017, Individual A was in communication with a phone registered to MIXON at approximately 1:35 p.m.

### *Agents execute a search warrant at the MIXON Residence*

36.     On or about December 12, 2017, Magistrate Judge Kim issued a warrant to search the MIXON Residence. Agents executed the warrant beginning at approximately 11:10 p.m. When agents entered and traveled upstairs, they encountered MIXON and Individual C lying prone on the floor. Within arm's reach of MIXON in a dog bed, agents found a loaded pistol that had been reported stolen, according to a law enforcement database. MIXON was lying between the pistol and

Individual C. Agents searched the master bedroom and found a shot gun in the closet and an AR-15 assault rifle underneath the bed. In addition, agents found another handgun in a back pack in the closet near the ground-floor entrance. Individual C claimed to own the gun in the back pack, the shotgun, and the AR-15, but not the stolen pistol that was a few feet away from MIXON.

37.     Agents searched the MIXON residence and found various controlled substances. Specifically, in a Victoria's Secret bag in the basement, agents found what field-tested presumptively positive for the presence of cocaine. Agents also found the following substances (which were presumptively identified through offsite testing): approximately 1,005 grams of cyclohexyl fentanyl; approximately 520 grams of a mixture of cyclohexyl fentanyl and butyryl fentanyl (the same substances found in Subject Parcel 2, which was earlier found in LACKLAND's possession); and approximately 511 grams cyclopropyl fentanyl, among other things.

38.     During the search, agents found approximately $10,000 in U.S. currency.

39.     In the garage, agents found what is thought to be black tar heroin.

40.     Agents also located materials in the garage consistent with manufacturing drugs, including boxes containing lactose, which—based on my training and experience—I know is used as a cutting agent in the manufacturing of drugs.

41.     Also found in the garage were the previously-observed garbage bags. They contained blenders with powder residue, drug presses, a scale with residue,

baggies, Tupperware containers, heat sealer and bags, screens, gloves. Based on my training and experience, I know these tools are used to manufacture, package, and sell narcotics.

FURTHER AFFIANT SAYETH NOT.

MARK WASUNYK
Special Agent
Homeland Security Investigations

SUBSCRIBED AND SWORN to before me on December 13, 2017.

YOUNG B. KIM
United States Magistrate Judge

18